UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YE CHEN, Derivatively on Behalf of STUBHUB HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ERIC H. BAKER, SAMEER BHARGAVA, JEFFREY BLACKBURN, CONNIE JAMES, SUNDAR KODIALAM, JEREMY LEVINE, THOMAS A. PATTERSON, and MARK STREAMS, <br><br> Defendants, <br><br> and <br><br> STUBHUB HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Ye Chen ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant StubHub Holdings, Inc. ("StubHub" or the "Company"), against the Company's Board of Directors (the "Board") and certain of its executive officers, for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below).

Plaintiff's allegations are based on personal knowledge as to himself and his own acts. As to all other matters, Plaintiff's allegations are based upon information and belief and supported by the investigation conducted by counsel, including, *inter alia*,: a review of publicly available information regarding StubHub; the allegations of a class action captioned *Salabaj v. StubHub Holdings, Inc., et al.*, Case No. 1:25-cv-09776-JMF (S.D.N.Y. Nov. 24, 2025) (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States

1

Securities and Exchange Commission (the "SEC"); press releases disseminated by StubHub; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of StubHub against certain of StubHub's officers and directors, seeking to remedy their wrongdoing and violations of federal law and breaches of fiduciary duty that have occurred from at least September 17, 2025 to the present (the "Relevant Period").

2.      StubHub operates a website and mobile application where users can purchase and sell tickets to live events.

3.      On September 17, 2025, the Company conducted an initial public offering ("IPO").

4.      The materials disseminated to prospective investors in connection with the IPO contained statements that were materially false and misleading, failing to disclose, *inter alia,* that: (1) StubHub's Direct Issuance platform as a means of expansion into the Original Issuance Ticketing Market would not and could not produce any near-term material financial benefit or growth and (2) the Company's free cash flows faced a declining trend due to changes in the timing of payments to vendors.

5.      On November 13, 2025, the Company reported, *inter alia*, a 143% year-over-year decline in free cash flows for the third quarter of 2025, attributable to "changes in the timing of payments to vendors."

6.      On this news, the price of the Company's stock fell $3.95 per share, or 20.9%, from a closing price of $18.82 per share on November 13, 2025 to a closing price of $14.87 per share on November 14, 2025.

7.      On March 4, 2026, StubHub announced that it was reclassifying its Direct Issuance opportunity from an immediately available opportunity that the Company was well-

2

positioned to realize in the near-term to a longer-term growth opportunity.

8. On this news, the price of the Company's stock fell $1.26 per share, or about 12%, from a closing price of 10.17 on March 4, 2026 to a closing price of $8.91 on March 5, 2026.

9. As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers and directors, exposing the Company to massive class-wide liability.

10. Additionally, in breach of their fiduciary duties, three of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $632,452.

11. In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, their collective engagement in fraud, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under and Section 11(f) of the Securities Act of 1933, 15 U.S.C. §77k(f)(1) (the "Securities Act") and Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(f) (the "Exchange Act"). This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in this District or an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, StubHub maintains principal executive offices in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District. The Securities Class Action is also pending in this District.

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

## PARTIES

17.     Plaintiff has been, at all relevant times, a shareholder of StubHub. Plaintiff acquired shares of StubHub common stock in connection with the Company's IPO and has continuously held through the Relevant Period.

18.     Nominal Defendant StubHub is incorporated under the laws of Delaware, with its principal executive offices located at 175 Greenwich Street, 59th Floor, New York, New York 10007. StubHub common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "STUB."

19.     Defendant Eric H. Baker ("Baker") co-founded StubHub and has served as the Company's Chief Executive Officer ("CEO") and as Chairman of the Board since 2006. As of

4

September 4, 2025, following the IPO, Defendant Baker beneficially owned 14,628,264 shares of Class A common stock and 24,750,000 of Class B common stock worth roughly $925.4 million.[1] As such, Defendant Baker holds 88.3% of the total voting power in the Company. Accordingly, Defendant Baker is a majority and controlling shareholder of StubHub. Defendant Baker is named as a defendant in the Securities Class Action.

20.    Defendant Sameer Bhargava ("Bhargava") has served as a member of the Board since 2016 and serves as Chair of the Audit Committee. As of September 4, 2025, Defendant Bhargava beneficially owned 623,180 shares of Class A common stock, worth roughly $14.6 million. Defendant Bhargava is named as a defendant in the Securities Class Action.

21.    Defendant Jeffrey Blackburn ("Blackburn") has served as a member of the Board since the IPO and serves as a member of the Audit Committee. As of September 4, 2025, Defendant Blackburn beneficially owned 126,113 shares of Class A common stock, worth roughly $2.9 million.

22.    Defendant Connie James ("James") has served as StubHub's Chief Financial Officer ("CFO") since August 2023. Defendant James is named as a defendant in the Securities Class Action. As of September 4, 2025, Defendant James beneficially owned 309,690 shares of Class A common stock, worth roughly $7.3 million.

23.    Defendant Sundar Kodialam ("Kodialam") has served as a member of the Board since the IPO and serves as a member of the Audit Committee. As of September 4, 2025, Defendant Kodialam beneficially owned 164,704 shares of Class A common stock, worth roughly $3.9

---

[1] Valuations of the Individual Defendants' holdings of Class A common stock are based on the price per share of StubHub stock at the time of the IPO, or $23.50. The valuations assume that the fair market value of StubHub Class B common stock, which is not listed on any securities exchange, is equal to the fair market value of StubHub Class A common stock, as each share of Class B common stock is convertible into one share of Class A common stock at any time at the option of the holder.

million.

24. Defendant Jeremy Levine ("Levine") has served as a member of the Board since March 2025. Defendant Levine is named as a defendant in the Securities Class Action. As of September 4, 2025, Defendant Levine beneficially owned 27,113,104 shares of Class A common stock, worth roughly $637.2 million and granting Defendant Levine 1.0% of the total voting power in the Company.

25. Defendant Thomas A. Patterson ("Patterson") has served as a member of the Board since the IPO. As of September 4, 2025, Defendant Patterson beneficially owned 75,792,821 shares of Class A common stock, worth roughly $1.8 billion and granting Defendant Patterson 2.7% of the total voting power in the Company.

26. Defendant Mark Streams ("Streams") has served as StubHub's General Counsel since 2011 and as a member of the Board since 2016. Defendant Streams has additionally served as Executive Vice Chairman of the Board since April 2024 and as StubHub's Chief Legal Officer since July 2025. As of September 4, 2025, Defendant Streams beneficially owned 1,800,850 shares of Class A common stock, worth roughly $42.3 million. Defendant Streams is named as a defendant in the Securities Class Action.

27. Defendants Baker, Bhargava, Blackburn, James, Kodialam, Levin, Patterson, and Streams are collectively referred to herein as the "Individual Defendants" and with StubHub, the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28. By reason of their positions as officers and/or directors of StubHub, and because of their ability to control the business and corporate affairs of StubHub, the Individual Defendants owed StubHub and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage StubHub in a fair, just,

6

honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of StubHub and its shareholders.

29.     Each director and officer of the Company owes to StubHub and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of StubHub, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of StubHub were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of StubHub, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

34.     To discharge their duties, the officers and directors of StubHub were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of StubHub were required to, among other things:

a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to StubHub's own Code of Business Conduct and Ethics (the "Code of Conduct");

b)     Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)     Remain informed as to how StubHub conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry and to take steps to correct such conditions or practices;

d)     Establish and maintain systematic, accurate records and reports of the business and internal affairs of StubHub and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)     Maintain and implement an adequate and functioning system of internal

8

legal, financial, and management controls, such that StubHub's operations would comply with all laws and StubHub's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f)  Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate;

g)  Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)  Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

35.  Each of the Individual Defendants further owed to StubHub and the shareholders the duty of loyalty requiring that each favor StubHub's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

36.  At all times relevant hereto, the Individual Defendants were the agents of each other and of StubHub and were at all times acting within the course and scope of such agency.

37.  Because of their advisory, executive, managerial, and directorial positions with StubHub, each of the Individual Defendants had access to adverse, non-public information about the Company.

38.  The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by StubHub.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, violate applicable laws, and artificially inflate the Company's stock price.

42.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of StubHub, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

43.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

44.     At all relevant times, each of the Individual Defendants acted as an agent of the

10

other Defendants and of StubHub, and at all times operated within the course and scope of that agency.

**STUBHUB'S CODE OF CONDUCT**

45.     StubHub's Code of Conduct applies to "[a]ll directors, officers and employees" of the Company, referred to in the Code of Conduct as "Covered Parties," and violations of the Code of Conduct will lead to "disciplinary action" including "reprimand, termination with cause, and possible civil and criminal prosecution."

46.     The Code of Conduct states that its purpose is to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
- Full, fair, accurate, timely and understandable disclosures;
- Compliance with applicable laws and governmental rules and regulations;
- Accountability for adherence to and consistent enforcement of the Code, including clear and objective standards for compliance and a fair process by which to determine violations;
- Prompt internal reporting of any violations of law or the Code;
- Protection for persons reporting any such questionable behavior;
- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and
- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

47.     In a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that may make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a Covered Party, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position at the Company.

Conflicts of interest can also occur indirectly. For example, a conflict of interest may arise when a Covered Party is also an executive officer, a major shareholder or has a material interest in a company or organization doing business with the

11

Company.

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company should be disclosed promptly to the Company's General Counsel.

48.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of

Conduct states, in relevant part:

The Company is obligated to comply with all applicable laws and governmental rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

49.     In a subsection titled "Insider Trading," the Code of Conduct states:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material non-public information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Please refer to the Company's Insider Trading Compliance Policy and Procedures for more information.

50.     In a section titled "Fair Dealing," the Code of Conduct states:

Each Covered Party should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No Covered Party may take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice. Inappropriate use of confidential or proprietary information, misusing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is also prohibited.

51.     In a section titled "Protection and Proper Use of Company Assets," the Code of

Conduct states:

All Covered Parties should protect the Company's assets and ensure their efficient

12

use. Theft, carelessness and waste have a direct impact on the Company's profitability. All Company assets should be used only for legitimate business purposes. The obligation of employees to protect the Company's assets includes its confidential or proprietary information.

52.    In a section titled "Accuracy of Business Records," the Code of Conduct states:

All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles and to the Company's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. Covered Parties should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

## STUBHUB'S AUDIT COMMITTEE CHARTER

53.    The purpose of StubHub's Audit Committee is to:

[A]ssist the Board in its oversight responsibilities with respect to: (i) the Company's accounting and financial reporting processes and the audits of the financial statements of the Company (ii) the integrity of the Company's financial statements; (iii) the Company's internal controls and procedures designed to promote compliance with accounting standards and applicable legal and regulatory requirements; (iv) the appointment of the independent auditor and the evaluation of the independent auditor's qualifications, independence and performance; (v) designated risk oversight matters; and (vi) the design and implementation of the Company's internal audit function and the performance of the Company's internal audit function after it has been established.

54.    The Audit Committee Charter tasks the Audit Committee with the following responsibilities:

Annual Audit

- *Scope of Annual Audit.* The Committee will review with the independent auditor and management the scope of the proposed audit plan for the current year and, at the conclusion thereof, review such audit and any comments and recommendations of the independent auditors.

- *Accounting Adjustments.* The Committee will discuss with the independent auditor and management any accounting adjustments that were noted or proposed by the independent auditor but not adopted or reflected.

- *Required Communications.* The Committee will discuss with the independent auditor any matters required to be communicated to the Committee by the independent auditor under applicable standards of the Public Company

13

Accounting Oversight Board ("PCAOB") or applicable law or listing standards, including the matters required to be discussed by PCAOB Auditing Standard No. 1301 relating to the conduct of the audit.

- *Audit Problems.* The Committee will discuss with the independent auditor and management any audit problems or difficulties and management's response.

- *Audit Committee Report.* The Committee will provide the Company with the report of the Committee with respect to the audited financial statements.

<u>Annual and Quarterly Financial Statements</u>

- *Form 10-K Review.* The Committee will review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's annual report on Form 10-K prior to issuance or filing. The Committee will recommend to the Board, if appropriate, that the Company's annual audited financial statements be included in the Company's annual report on Form 10-K for filing with the SEC.

- *Form 10-Q Review.* The Committee will review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's quarterly reports on Form 10-Q prior to issuance or filing.

<u>Other Duties and Responsibilities</u>

- *Review of Earnings and Financial Information.* The Committee will review any earnings press releases or other financial information and earnings guidance provided to third parties, as applicable.

- *Risk Assessment and Risk Management.* The Committee will review the Company's policies with respect to risk assessment and risk management. In order to facilitate this review, the Committee will meet in executive session with management, including the Company's General Counsel, and review reports of management and representatives of any external advisors as appropriate. The Committee will provide regular reports to the Board.

\* \* \*

- *Internal Audit Processes.* The Committee will review the appointment and audit plan of the internal auditor, if applicable. The Committee will provide oversight of the internal audit department objectives, its mission, responsibilities, independence, performance and annual plan. The Committee will review any significant issues raised in reports to management by the internal audit team, as

well as management's response.

- *Critical Accounting Policies.* The Committee will review and discuss with management and the independent auditor the Company's critical accounting policies and significant changes in the Company's selection or application of accounting principles. This discussion will include alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, including ramifications of the use of such alternative disclosure and treatments, and the treatment preferred by the independent auditors and the impact of each on the quality and reliability of the Company's financial reporting, and other material communications with management, such as any management letter or schedule of unadjusted differences. The Committee will also review and discuss the effect of regulatory and accounting initiatives on the financial statements of the Company, and critical audit matters addressed during the audit.

- *Non-GAAP Financial Measures.* The Committee will review with management the preparation, presentation and integrity of non-GAAP financial measures used by the Company. The Committee will review the non-GAAP financial measures to understand how management evaluates performance, whether the metrics are consistently prepared and presented from period to period, and the related non-GAAP disclosure policies.

- *Disclosure Controls and Procedures.* The Committee will review and discuss with management, and to the extent the Committee deems necessary or appropriate, the independent auditor, the Company's disclosure controls and procedures that are designed to ensure that the reports the Company files with the SEC comply with the SEC's rules and forms.

- *Review of Code of Conduct.* The Committee will periodically consider and discuss with management and the independent auditor the Company's code of conduct or other comparable policy and the procedures in place for the enforcement thereof.

\* \* \*

- *Complaint Procedures.* The Committee will establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

\* \* \*

- *Compliance Matters.* If requested by the Committee or the Chair of the Committee, the Company's General Counsel will meet with the Committee, or

15

the Chair of the Committee, to provide a report on compliance matters.

## SUBSTANTIVE ALLEGATIONS

### I.    Background

55.    StubHub is an online platform where users can buy and sell tickets to live events.

56.    On March 21, 2025, StubHub filed a Registration Statement on Form S-1 with the SEC which, after several amendments, was declared effective on September 16, 2025.

57.    On September 17, 2025, StubHub filed a final prospectus on Form 424B4 with the SEC (the "Prospectus"), which was incorporated into and forms part of the Registration Statement (the Prospectus and the Registration Statement are collectively referred to herein as the "Offering Documents").

58.    On September 17, 2025, pursuant to the Offering Documents, the Company conducted its IPO, generating net proceeds of approximately $758.5 million through the sale of approximately 34,042,553 shares of Class A common stock at a price of $23.50 per share.

### II.    False and Misleading Statements Concerning StubHub's Free Cash Flow

59.    The Offering Documents identified free cash flow as one of three "key business metrics" that the Company believed useful for evaluating StubHub's business and operations, describing free cash flow as "a meaningful indicator of liquidity for management and investors" because it represented "the amount of cash generated from operations that, after capital expenditures, can be used for strategic initiatives, including continuous investment in our business and strengthening our balance sheet."

60.    The Offering Documents reported StubHub's free cash flow figures as follows:

**Free Cash Flow**

We define free cash flow as net cash provided by (used in) operating activities less capital expenditures, which includes purchases of property and equipment, purchases of intangible assets and capitalized software development costs. We

believe that free cash flow is a meaningful indicator of liquidity for management and investors and, in particular, the amount of cash generated from operations that, after capital expenditures, can be used for strategic initiatives, including continuous investment in our business and strengthening our balance sheet. A limitation of the use of free cash flow is that it does not represent the total increase or decrease in our cash balance for the period. Free cash flow should not be considered in isolation or as an alternative to cash flows from operations and should be considered alongside our other financial liquidity measures, such as net cash provided by (used in) operating activities and our other GAAP results.

The following table presents a reconciliation of net cash provided by (used in) operating activities, the most directly comparable financial measure presented in accordance with GAAP, to free cash flow:

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2025 | 2024 | 2024 | 2023 | 2022 |
| | | | (in thousands) | | |
| Net cash provided by (used in) operating activities[(1)] | $177,641 | $398,578 | $261,487 | $307,391 | $(47,521) |
| Less: Purchases of property and equipment | (798) | (680) | (1,666) | (1,722) | (1,648) |
| Less: Purchases of intangible assets | (942) | (1,182) | (2,086) | (1,706) | — |
| Less: Capitalized software development costs | (15,075) | (1,583) | (2,625) | (2,009) | (658) |
| Free cash flow | $160,826 | $395,133 | $255,110 | $301,954 | $(49,827) |

61.     With respect to the Company's free cash flow, the Offering Documents additionally stated:

Seasonal trends in our GMS and the timing of major events throughout the year impact free cash flow for any given quarter and can vary year to year. For example, in 2024 an atypical concentration of seller payments resulted in negative free cash flow for the fourth quarter. *As a result, we track our TTM free cash flow to account for the timing difference in when we receive cash, which is at the time of transaction, and when we remit cash to sellers, which is at a later date. TTM free cash flow provides a longer-term view of our business that is less impacted by the seasonality of GMS and seller payments.*[2]

For the year ended December 31, 2023, free cash flow was $302.0 million compared to free cash flow of $(49.8) million for the year ended December 31, 2022. The increase in free cash flow was driven by rapid growth of our business and operating leverage following the integration of StubHub, our capital-light business model and our favorable working capital dynamic, which drives cash flow generation as our GMS grows, offset by interest payments on our outstanding debt.

For the year ended December 31, 2024, free cash flow was $255.1 million compared to free cash flow of $302.0 million for the year ended December 31,

---

[2] Unless otherwise noted, all emphasis added.

2023. The decrease in free cash flow was primarily driven by a strategic decision to invest in new initiatives, such as direct issuance.

In the first half of 2025, free cash flow was $160.8 million compared to free cash flow of $395.1 million in the first half of 2024. The decrease in free cash flow primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.

62.    The Offering Documents included the following graphic regarding the Company's "trailing 12 months ('TTM') free cash flow for the periods presented":



63.    The statements identified above in the Offering Documents were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) StubHub's timing of payments to vendors was undergoing changes; (ii) these changes negatively affected the Company's free cash flow, including TTM free cash flow; and (iii) as a result of the foregoing, the Company's reported free cash flow was materially false and misleading and positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis at all relevant times.

### III.    *False and Misleading Statements Concerning the Original Issuance Ticketing Market and Direct Issuance*

64.    Historically, StubHub has operated primarily in the Secondary Ticketing Market whereby those who purchased tickets to live events directly from the original "content rights holders" could resell their tickets via StubHub. In its Offering Documents, StubHub portrayed itself as positioned to enter and increase its revenue from what the Company calls the "Original Issuance Ticketing Market." Through "Direct Issuance," content rights holders would be able to sell tickets directly to buyers via the StubHub platform.

65.    The Offering Documents presented its entry into the Original Issuance Ticketing Market, via adoption of a non-exclusive "Direct Issuance" ticketing model, as a primary driver of StubHub's near- and medium-term revenues, margins, and earnings.

66.    Om the Offering Documents, the Original Issuance Ticketing Market was classified as part of StubHub's Serviceable Addressable Market:

> We view our market opportunity in terms of a Serviceable Addressable Market ("SAM"), which we address today, and a Total Addressable Market ("TAM"), which we believe we can address over the long term. ***Our SAM today includes the global markets for secondary, original issuance and unsold tickets.*** We believe we are the leader in the $18 billion North American secondary ticketing market based on our GMS for 2024 as compared to similar metrics of our largest competitors for 2024. See "Glossary" for additional information. We believe we are also the category leader in the international secondary ticketing market due to the fragmented, localized and offline nature of the existing international market for secondary ticket sales. We believe the international secondary ticketing market represents a $23 billion opportunity over the medium term as these markets continue to be penetrated by global digital commerce. ***We are also growing in the $132 billion global original issuance ticketing market and believe we can help enable the distribution and recovery of approximately $22 billion in unsold tickets through our marketplace. Together these markets represent our SAM, which we estimate to be $194 billion.***

67.    The Offering Documents stated:

> We are in the early innings of targeting the original issuance ticketing market and bringing content rights holders to our platform. Our vision for direct issuance is that content rights holders will list tickets directly on our marketplace as any other

19

seller would at scale. While we are aware that certain content rights holders have historically used our marketplace from time to time, the supply side of our platform has been built primarily to service individual sellers and professional sellers in the secondary ticketing market. ***We are focused on expanding the supply on our marketplace to include original issuance tickets and aim to expand our offerings to include a full suite of product features to better service content rights holders to allow them to seamlessly manage the pricing and distribution strategies for their larger ticket portfolios.***

68.     The Offering Documents represented that "[w]e believe we have built a platform that is well-positioned to tackle," among other things, the Original Issuance Ticketing Market.

69.     The Offering Documents stressed that direct issuance was a near-term opportunity by conveying, throughout the Offering Documents, that various "marquee" content rights holders had already been using StubHub's Direct Issuance product. For instance, the Offering Documents stated:

> ***Several marquee content rights holders, including teams in major U.S. and international professional sports leagues as well as major musical artists and festivals, have already begun selling original issuance tickets through our marketplace.*** In 2024, we surpassed $100 million of annual direct issuance GMS, approximately 50% of which was derived from sales of tickets for which we assumed any amount of inventory risk.

70.     The Offering Documents further stated:

> We are even more excited about the larger opportunity to build the global destination for consumers to access live events and experiences, which represents a global market opportunity that is significantly larger than secondary ticketing. ***Having surpassed $100 million in annual direct issuance GMS in 2024, we are in the early stages of what we believe will be a major disruption to the way original issuance tickets are distributed. We believe that we are well-positioned to enable more categories of live events and experiences on our marketplace,*** further monetize ancillary revenue streams and play an even more vital role in the ecosystem in the future.

71.     The Offering documents reinforced StubHub's imminent expansion in the Original Issuance Ticketing Market, explaining that it would be "increasingly target[ing] the original issuance ticketing market":

**Our Mutually Reinforcing Flywheels**

20

The success of our marketplace and our ability to attract supply and demand is accelerated by our mutually reinforcing flywheels that create a powerful network effect for our business. ***The combination of our end-to-end technology, global distribution and data intelligence, enhanced by our category-defining brands, gives rise to multiple flywheel effects that enable our market share capture in secondary ticketing and unlock our opportunity in direct issuance and other adjacent markets.***

* * *

We believe our audience-content flywheel is in its beginning stages a***s we increasingly target the original issuance ticketing market***. We expect this flywheel to accelerate as we invest in strategies to propel us towards our vision of becoming the global destination for consumers to access live events and experiences, ***offering content rights holders powerful distribution and monetization capabilities. Consequently, we believe this positions us to disrupt the legacy primary ticketing model and unlock a vastly expanded market opportunity.***

72.    With respect to the opportunity to build its engagement with the Original Issuance Ticketing Market, the Offering Documents stated:

**Our Market Opportunity**

We believe we are the category leader in the large and growing global secondary ticketing market, where we generated substantially all of our GMS in 2024. We believe we have a major growth opportunity ahead of us in secondary ticketing alone. We are even more excited about the larger opportunity to build the global destination for consumers to access live events and experiences, which represents a global market opportunity that is significantly larger than secondary ticketing. Having surpassed $100 million in annual direct issuance GMS … in 2024, we are in the early stages of what we believe will be a major disruption to the way original issuance tickets are distributed. ***We believe that we are well-positioned to enable more categories of live events and experiences on our marketplace, further monetize ancillary revenue streams and play an even more vital role in the ecosystem in the future.***

73.    The statements identified above in the Offering Documents concerning the near-term nature of StubHub's Direct Issuance/Original Issuance Ticketing Market opportunities were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Direct Issuance/Original Issuance Ticketing Market was not achievable in the near-term; (ii) at the time of the IPO,

21

StubHub's Direct Issuance platform not ready for complete commercial deployment and would not be ready for the foreseeable future; (iii) as a result of the foregoing, Direct Issuance would not and could not produce any near-term material financial benefit or growth; and (iv) as a result of the foregoing, the Company's positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis at all relevant times.

### IV.    *False and Misleading Statement Concerning Risk Disclosures*

74.    The Offering Documents contained and incorporated generalized and vague "Risk Factors," that claimed to warn investors of unrealized future risks that could or may happen in the future while, in reality, those risks were already occurring at the time of the IPO.

75.    With respect to risks related to fluctuations in the Company's financial results caused by the timing of vendor payments, the Offering Documents stated:

> *Our results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years.*
>
> We believe our financial results and cash needs will vary greatly from quarter to quarter and year to year depending on, among other things, *the timing of and demand for certain tours, tour cancellations, event ticket sales, seasonal and other fluctuations in our results of operations, the timing of guaranteed payments, financing activities, acquisitions and investments and receivables management.* For example, the timing of and demand for top sporting events and concert tours, such as the Super Bowl, the UEFA Champions League Final, the
>
> FIFA World Cup, Elton John's "Farewell Yellow Brick Road" tour, Taylor Swift's "Eras" tour, can impact comparability of quarterly results year-over-year, and potentially annual results also. Similarly, the number of games or matches in sports playoff series, the teams involved and demand for certain games or matches can vary year-over-year and impact our results. We have in the past experienced variations in revenue based on the timing of and demand for certain experiences or events, such as major sports league seasons, the timing of certain international sporting events, tour schedules of certain artists and popular theater or concert events. Because our results may vary significantly from quarter to quarter and year to year, our financial results for one quarter or year cannot necessarily be compared to another quarter or year and may not be indicative of our future financial performance in subsequent quarters or years. Moreover, seasonality in our business

22

could create cash flow management risks if we do not adequately anticipate and plan for periods of decreased activity, which could adversely impact our ability to execute on our strategy, which in turn could harm our business, financial condition, results of operations and prospects.

76.     The statements identified above in the Offering Documents concerning risk disclosures regarding StubHub's free cash flow were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) StubHub's timing of payments to vendors was undergoing changes; (ii) these changes negatively affected the Company's free cash flow, including TTM free cash flow; and (iii) as a result of the foregoing, the Company's reported free cash flow was materially false and misleading and positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis at all relevant times.

77.     With respect to risks related to StubHub's expansion into the Original Issuance Ticketing Market through its Direct Issuance platform, the Offering Documents stated:

> There can be no assurance that we will succeed in expanding the adoption of our platform for direct issuance or that any demand for future offerings or initiatives we may pursue, including additional live event and experience categories and adjacent market opportunities across the live event ecosystem, will exist, develop or be sustained. Further, these efforts entail investments in and resources spent on our systems and infrastructure, payments platform, and increased legal and regulatory compliance expenses, which could distract management and divert capital and other resources from our more established offerings. **If** we are unsuccessful in executing on our business strategy to reach more categories of events and experiences, including through direct issuance, our business and growth prospects **may** be harmed.
>
> ***
>
> **If** content rights holders are not convinced of the value proposition of our marketplace, **if** we are unsuccessful in building and maintaining relationships with content rights holders, or **if** we do so in a way that is not profitable or fails to compete successfully against our current or future competitors, we **may** be unable to realize the objectives of this business strategy or realize our anticipated value in the original issuance ticketing market.
>
> ***
>
> Furthermore, the adoption of our platform for direct issuance is subject to a

23

number of factors, some of which may be out of our control, including the ability or willingness of content rights holders to use our platform to sell original issuance tickets, our competitors' exclusivity rights governing ticket sales for certain events or venues or buyers' willingness to engage with our brands and marketplace as a source for original issuance ticket purchases. **If** we are not able to expand the adoption of our platform for direct issuance in a cost-effective manner, our growth prospects would be adversely affected.

78.    The statements identified above in the Offering Documents concerning risk disclosures regarding StubHub's market opportunities, infrastructure, and readiness for entry into the Original Issuance Ticketing Market were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Direct Issuance/Original Issuance Ticketing Market was not achievable in the near-term; (ii) at the time of the IPO, StubHub's Direct Issuance platform was incomplete and not ready for complete commercial deployment; (iii) as a result of the foregoing, Direct Issuance would not and could not produce any near-term material financial benefit or growth and (iv) as a result of the foregoing, the Company's positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

79.    On November 13, 2025, StubHub issued a press release announcing the Company's third quarter 2025 financial results. For the quarter, the press release reported free cash flow of negative $4.6 million, a 143% decline year-over-year, and net cash provided by operating activities of $3.8 million, a 69.3% decline year-over-year. Specifically, the press release reported:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| | (in thousands) | | | |
| Net cash provided by (used in) operating activities [1] | $ 3,795 | $ 12,357 | $ 181,436 | $ 410,935 |
| Less: Purchases of property and equipment | (372 ) | (646 ) | (1,170 ) | (1,326 ) |
| Less: Purchases of intangible assets | (256 ) | (588 ) | (1,198 ) | (1,770 ) |
| Less: Capitalized software development costs | (7,767 ) | (521 ) | (22,842 ) | (2,104 ) |
| Free cash flow | $ (4,600 ) | $ 10,602 | $ 156,226 | $ 405,735 |
| TTM free cash flow | $ 5,601 | $ 501,492 | $ 5,601 | $ 501,492 |

80.    That same day, StubHub filed a quarterly report on Form 10-Q for the third quarter of 2025 with the SEC, which was signed by Defendants Baker and James and contained certifications pursuant to the Sarbanes-Oxley Act of 2022 also signed by Defendants Baker and James. The Form 10-Q attributed the decline in the Company's free cash flow primarily to "**changes in the timing of payments to vendors**." Specifically, the Company disclosed:

> ***During the three months ended September 30, 2025, the decrease in free cash flow, compared to the same periods in the prior year, primarily reflects changes in the timing of payments to vendors.***
>
> During the nine months ended September 30, 2025, the decrease in free cash flow, compared to the same period in the prior year, primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.
>
> During the period ended September 30, 2025, the decrease in TTM free cash flow, compared to the same period in the prior year, primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.

81.    Confirming that StubHub management was aware of the declining trend in the Company's cash flows at the time of the IPO, the quarterly report additionally reported a downward trend of free cash flow and TTM free cash flow in 2025:

25

|  | Three Months Ended (in thousands) | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 9/30/25 | 6/30/25 | 3/31/25 | 12/31/24 | 9/30/24 |
| FCF | ($4,600) | $9,716 | $151,110 | ($150,625) | $10,602 |
| TTM FCF | $5,601 | $20,803 | $147,529 | $225,110 | $501,492 |

82.    On this news, the price of StubHub stock declined $3.95 per share, or 20.9%, from a close of $18.82 per share on November 13, 2025 to a close of $14.87 per share on November 14, 2025.

83.    Over the following week, the price of StubHub stock continued to decline, closing at $10.31 per share on November 20, 2025, a 56% decline from the $23.50 per share IPO price.

84.    Given that the IPO took place just two weeks before the close of the third quarter, and that StubHub was undoubtedly aware of the timing of its own payment schedules with vendors, StubHub had to have been aware, at the time of the IPO, that its free cash flow would continue to trend downward but failed to disclose that information.

85.    On March 4, 2026, StubHub issued a press release announcing its fourth quarter 2025 financial results. Therein, the Company reclassified its Direct Issuance platform from a near-term, immediately available opportunity to "longer-term growth opportunities" and "transformational long-term opportunities." The press release further disclosed that Direct Issuance would not yield any meaningful revenues for at least all of 2026. The Company attributed this reclassification to a strategic decision to focus on making its Direct Issuance product more capable of meeting the needs of content rights holders and making the investments and improvements necessary to do so. The press release stated, in relevant part:

> *[W]e are evolving our Direct Issuance Strategy toward a more scalable, less capital-intensive growth model, which naturally reduces investment intensity.* In FY 2025, our catalogue growth strategy was defined primarily through a business development-led approach to establish relationships and bring inventory onto the platform. *Based on what we've learned about the needs of content rights holders, we are shifting more of our effort toward building a technology*

*enabled ecosystem that makes Direct Issuance easier to adopt and operate at scale across a broader set of rights holders.*

\* \* \*

*Looking ahead, our experience has reinforced that the largest market potential will come from making Direct Issuance frictionless to adopt across a much broader range of rights holders. That requires reducing operational friction* for partners with varying levels of technological sophistication – and advances in artificial intelligence are materially expanding what is now practical to build on the supply side. By leveraging these advancements, we believe we can bring capabilities to market that would have been difficult to deliver even a year ago— including AI-assisted tools that automate workflows and simplify inventory management.

*For FY2026, we are prioritizing building the product foundation required to scale Direct Issuance broadly. Accordingly, we are shifting from a primarily business development-led strategy to a more product-led strategy:* building an AI-enabled, technology-driven ecosystem that enables inventory to be contributed and managed with minimal operational burden. Development is underway to bring these supply-side products to market. *We believe this approach positions Direct Issuance to become a durable growth engine when this self-serve capability is in place. This strategy shift means we will not be optimizing for immediate revenue growth, but for maximizing our revenue opportunity over the longterm.*

86. These admissions regarding StubHub's ability to expand into the Original Issuance Ticketing Market stand in stark contrast to the representations made in the Offering Documents, which conveyed that StubHub was "well-positioned" to do so.

87. On this news, the price of the Company's stock fell $1.26 per share, or about 12%, from a closing price of 10.17 on March 4, 2026 to a closing price of $8.91 on March 5, 2026.

## INSIDER SALES

88. During the Relevant Period, Defendants Baker, James, and Streams (the "Insider Trading Defendants") each made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

27

89.     On October 21, 2025, while the Company's stock price was artificially inflated and prior to the truth's emergence, Defendant Baker sold $18,094 shares of StubHub common stock at an average price of $19.04 per share, generating $344,509 in proceeds.

90.     On October 21, 2025, while the Company's stock price was artificially inflated and prior to the truth's emergence, Defendant James sold $12,799 shares of StubHub common stock at an average price of $19.04 per share, generating $243,693 in proceeds.

91.     On October 21, 2025, while the Company's stock price was artificially inflated and prior to the truth's emergence, Defendant Streams sold 2,324 shares of StubHub common stock at an average price of $19.04 per share, generating $44,249 in proceeds.

92.     Thus, the Insider Trading Defendants collectively reaped approximately $632,451 in profits just weeks prior to the November 13, 2025 corrective disclosures, selling their personal holdings of Company stock at an average price of $19.04, substantially higher than stock's closing price of $14.87 after the corrective disclosures. These insider sales, made with knowledge of material nonpublic information before the November 13, 2025 disclosures demonstrates the Insider Trading Defendants' motive in facilitating and participating in the scheme.

## DAMAGE TO STUBHUB

93.     As a direct and proximate result of the Individual Defendants' misconduct, StubHub has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

94.     Such expenditures include, but are not limited to, legal fees associated with defending against the Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto as well as any payments for resolution or to satisfy judgements associate with any other lawsuits filed against the Company or the Individual Defendants based on the allegations contained herein.

28

95.     These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

96.     These losses also include, but are not limited to, substantial and unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

97.     As a direct and proximate result of the Individual Defendants' actions, StubHub has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

98.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

99.     StubHub is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

100.     Plaintiff has been a shareholder of StubHub since the time of the IPO, through the period of the Individual Defendants' wrongdoing alleged herein, and will continue to so hold. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

101.     A pre-suit demand on the Board of StubHub is futile and, therefore, excused. At the time this action was commenced, the seven-member Board was comprised of Defendants Baker,

Bhargava, Blackburn, Kodialam, Levine, Patterson, and Streams (the "Director Defendants"). Accordingly, Plaintiff is only required to show that a majority, i.e. four directors, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

102.    As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability. Accordingly, demand on the Board to institute this action would have been a futile act.

103.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

104.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

105.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

106.    The acts complained of herein constitute violations of fiduciary duties owed by StubHub's officers and directors, and these acts are incapable of ratification.

107.    Defendant Baker, as co-founder, CEO, and controlling shareholder, is not disinterested or independent and is therefore incapable of considering a demand. Accordingly, Defendant Baker cannot reasonably be expected to consider with disinterestedness whether to sue

30

fellow directors of a company that he founded and has helped build since inception.

108. Defendants Baker, Bhargava, Levine, and Streams are not disinterested or independent because they are named as defendants in the Securities Class Action and face significant personal liability based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

109. Defendants Bhargava, Blackburn, and Kodialam are not disinterested or independent because they served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. Despite their charged responsibilities, at all relevant times, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

110. Demand is further excused because each of the directors receive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein. In particular, Defendants Baker, Bhargava, Levine, Patterson, and Streams derive substantial income in connection with their relationship to StubHub, with each of the foregoing directors owning more than $10 million worth of StubHub stock.

111. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the directors to also adhere to the Company's standards of business conduct. Nonetheless, the Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

112. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. As such, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as futile.

113. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of StubHub. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of StubHub, there would be no

32

directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

114.    If there is no directors' and officers' liability insurance, then the directors will not cause StubHub to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

115.    Thus, for all of the reasons set forth above, all of StubHub's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIM I
### Against the Individual Defendants
### for Breach of Fiduciary Duties

116.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

117.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of StubHub's business and affairs.

118.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of StubHub's shareholders.

119.    In breach of their fiduciary duties owed to StubHub, the Individual Defendants

33

willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

120.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of StubHub's securities.

121.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, StubHub has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

### CLAIM II
**Against the Individual Defendants**
**for Aiding and Abetting Breach of Fiduciary Duty**

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

34

conduct complained of herein.

126. Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## CLAIM III
### Against the Individual Defendants
### for Unjust Enrichment

127. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of StubHub.

129. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from StubHub that were tied to the performance or artificially inflated valuation of StubHub, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

130. The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

131. Plaintiff, as a shareholder and representative of StubHub, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

132. Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## CLAIM IV
### Against the Individual Defendants
### for Waste of Corporate Assets

133. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

134. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused StubHub to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

135. Further, in light of the foregoing, the Company paid excessive salaries and fees, to the detriment of shareholders and the Company, to the Individual Defendants.

136. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

137. Plaintiff, on behalf of StubHub, has no adequate remedy at law.

### CLAIM V
**Against the Insider Trading Defendants
for Breach of Fiduciary Duties**

138. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139. During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding their duty to refrain from trading in StubHub common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects, netting combined total proceeds of approximately $632,452.

140. The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when

they sold StubHub stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

141.    The insider sales detailed herein were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

142.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## CLAIM VI
### Against the Individual Defendants
### For Abuse of Control

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The Individual Defendants, by their actions alleged herein, directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of StubHub in a manner consistent with the operations of a publicly held corporation.

145.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty as alleged herein, StubHub has sustained and will continue to sustain significant damages.

146.    As a result of the misconduct and breaches of duty as alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## CLAIM VII
### Against Defendants Baker, James, Streams, and Bhargava for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

37

148.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

149.    As a result of the misconduct alleged above, the Company is named as a defendant in the Securities Class Action, in which it is a joint tortfeasor, along with Defendants Baker, James, Streams, and Bhargava (the "Securities Class Action Individual Defendants"), in claims brought under Sections 11, 12(a), and 15 of the Securities Act.

150.    Federal law provides StubHub with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

151.    The plaintiff in the Securities Class Action alleges that the Offering Documents, filed with the SEC in connection with the Company's IPO, contained numerous untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

152.    StubHub is the registrant for the IPO, and the Securities Class Action Individual Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

153.    As the issuer of the shares, StubHub is strictly liable to the plaintiff in the Securities Class Action for the misstatements and omissions alleged therein.

154.    The plaintiff in the Securities Class Action alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and not misleading.

155.    The Securities Class Action Individual Defendants, because of their positions of control and authority as officers and directors of StubHub, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of StubHub, including the

38

wrongful acts complained of herein and in the Securities Class Action.

156.    Accordingly, the Securities Class Action Individual Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77K(f)(1)), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

157.    As such, StubHub is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Individual Defendants

158.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, structured in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing StubHub to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect StubHub and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 10, 2026

**THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

## **VERIFICATION**

I, Ye Chen, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Dated: 4/8/2026

Signed by:

*Ye Chen*

5C4C1F8278764A9...

Ye Chen